WILKINSON, Circuit Judge,
dissenting:
This case concerns whether advertisers pursuing a breach of contract class action met the commonality requirement of Rule 23(b)(3) for class certification, that “questions of law or fact common to class members predominate over any questions affecting only individual members.” Fed. R.Civ.P. 23(b)(3) (emphasis added). Plaintiffs contend that this standard was satisfied, but an irresolvable paradox lies at the heart of their position. On the one hand, plaintiffs insist that there is commonality due to a uniform distribution obligation in the contracts. See ante, at 701-02. Yet on the other, they nonetheless concede that extrinsic evidence, which inevitably will be individualized, is permissible and necessary to establish what the normal course of distribution even was. See ante, at 702. Because the integrated contracts in fact lack any uniform distribution term to supply the necessary commonality of law or fact, I respectfully dissent.
*703 I.
There is no uniform distribution policy in the contracts for the defendants to have allegedly breached. The contracts would be the logical place to look for such an obligation and if it were there, the certification could readily be affirmed. I have looked high and low for such a distribution term, but cannot find one for the simple reason that the contracts in this breach of contract action do not have one. It is the contracts that would have supplied a ready commonality for something that now is anybody’s guess.
The majority’s conclusion depends on its assertion that “during oral argument, White Directory conceded the contracts do contain a distribution obligation.” Ante, at 701. But concessions at oral argument, if made, are always to be taken cautiously and there remains no provision in the contract in which any distribution obligation is embodied.
So when and how was what to be distributed to whom? Plaintiffs fail to cite any language from the contracts to demonstrate that any such distribution obligation exists within them. They don’t do so because they can’t — such language is nowhere to be found in the contracts themselves.
II.
To establish a distribution requirement and demonstrate its breach therefore requires resort to individualized extrinsic evidence of exactly the kind deemed insufficient to support class certification by the Supreme Court in Wal-Mart under the even lower threshold of Rule 23(a)(2). See Fed.R.Civ.P. 23(a)(2) (requiring commonality of questions of law or fact, but not requiring predominance of those questions as in Rule 23(b)(3)); Wal-Mart Stores, Inc. v. Dukes, — U.S. -, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). In Wal-Mart, the Court was troubled by the lack of proof of a uniform discrimination policy. Likewise, in Hearst, there is no distribution term in the integrated contracts speaking to what appellees contend is the common issue demonstrating breach of contract. Without a contract term directly addressing the mechanics of distribution or the exact number of phone books to be distributed, plaintiffs must turn to individualized extrinsic evidence to establish an implied distribution term.
A.
To compensate for the contract’s silence on distribution and construct what might pass for a distribution policy, plaintiffs invite the district court to resort to extrinsic evidence regarding White Directory’s distribution practices. See ante, at 702. But by focusing on distribution practices, and not on the representations made to clients with respect to their individual contracts, plaintiffs are the ones that “miss[j the mark.” Ante, at 701. Any practice of distribution still begs the critical question of what that distribution number was or whether the clients had any uniform expectation of what it would be. Absent an explicit distribution term in the contracts, uniformity in actual distribution tells us nothing about the reliance interests of individual clients that could form the basis of a contractual breach. This is especially true if the expectations and intent of each client varied as a product of the individualized sales representations that client received.
With respect, the majority is mistaken in its attempt to distinguish Wal-Marl on the basis of White Directory’s “uniform distribution practice.” Ante, at 701. The relevant policy is not White Directory’s distribution practices, but rather its sales policy, which sheds light on the reliance interests of the parties and whether they were uniform. And in this respect, Wal- *704 Mart is squarely on point. Wal-Mart’s policy that granted broad discretion to local supervisors over pay and promotion (in conjunction with its written policy of nondiscrimination) was fatal to the plaintiffs’ assertion of commonality. As in Wal-Mart, White Directory’s sales policy was one of broad discretion. Specifically, salesmen had broad discretion to craft their sales pitch to the needs of the specific client.
As a result, there was substantial variation in written and oral sales pitches. Not all members of the class saw the same sales aids or the same salespersons nor were they subject to the same representations with respect to distribution. Evidence of the parties’ intent and expectations with respect to distribution will therefore necessarily be individualized and anecdotal, just like the evidence deemed insufficient in Walr-Mart. Thus, even if the actual distribution of phone books was uniform, the lack of uniformity in the representations to class members indicates that there is no “common answer” to the critical question of the intent of the parties to each contract. See Wal-Mart, 131 S.Ct. at 2552.
B.
The extrinsic evidence and the individualized nature of the claims deriving from it forecast all sorts of difficult problems down the road. Plaintiffs would need to introduce individualized evidence, of the kind rejected in Wal-Mart, to prove a specific numerical distribution term — specifically evidence of what sales aids were used or what sales pitches were given at individual meetings.* Individualized evi-dentiary hearings will be necessary to prove both injury and any damages that may flow from a breach of contract. In contrast, the class action device as applied to this variety of circumstances may force appellants into a one-size-fits-all defense, compromising what is and should have been their legitimate right to make a defense tailored to individual circumstances. In this case, therefore, the class action method hardly seems “superior to other available methods for fairly and efficiently adjudicating the controversy.” Fed. R.Civ.P. 23(b)(3).
III.
In the end, we are still left with the question, unanswered by the contract, of what the uniform distribution policy was. Plaintiffs want to have their cake and eat it too. They allege commonality for class certification on the basis of an alleged uniform distribution obligation, and yet expect use of extrinsic evidence to demonstrate that such an obligation existed and was breached. But just as the absence of a uniform discrimination policy was fatal to certification in Wal-Mart, so too is the absence of uniform representations with respect to distribution fatal to the certification effort here. Again, it is the representations that matter, because it is the violation of those representations that alone could lead to a viable breach of contract claim. Accordingly, there is no way to “resolve an issue that is central to the validity of each one of the claims in one stroke.” Wal-Mart, 131 S.Ct. at 2545. I would therefore reverse the class certification order in this case.

 It is worth emphasizing that even appellees have never identified a uniform distribution policy within the contracts as the basis for the breach. Rather, their theory of the case has always rested on extrinsic evidence of the representations about distribution made to clients in sales aids and sales conversations.